NORWICK, Respondent

v.

UNITED SECURITY LIFE COMPANY, Appellant

(152 N.W.2d 439)

(File No. 10327.   Opinion filed August 2, 1967)

**Davenport, Evans, Hurwitz & Smith, Robert C. Heege,** Sioux Falls, for defendant and appellant.

**Tinan, Carlson & Padrnos,** Mitchell, for plaintiff and respondent.

ROBERTS, Judge.

Plaintiff instituted this action to recover the sum of $5,000 with interest on a policy of insurance issued by defendant company upon the life of his daughter Jeanne Norwick. The policy together with the application attached was issued on August 5, 1963. On November 27, 1963, Jeanne Norwick died. The complaint alleges that plaintiff beneficiary notified defendant of the death of insured and made proof of death and demanded payment of the amount due under the policy.

Defendant's answer is a denial of the allegations in the complaint except certain admissions made therein. It alleges that insurer was induced to issue its policy relying on false and fraud-

ulent representations of the plaintiff and therefore the policy was at its inception void. Defendant denied liability, but tendered a return of the premium paid. There was a trial to the court which resulted in findings, conclusions and judgment for the plaintiff. Defendant appeals.

Jeanne Norwick was eighteen years of age when she died. The doctor who had treated Jeanne at different times and was the attending physician at the time of her death testified that she "was dwarfish in her bodily form * * * had what's termed a mongoloid facies * * * could not speak * * * or read, and wasn't capable of caring for herself"; that her life expectancy was "considerably shorter than a normal person"; and that death of a mongoloid "usually occurs before age 25, with respiratory infections, heart disease, and tuberculosis as prime causes". Plaintiff admits that three days prior to the signing of the application Jeanne was admitted to a hospital and was there a patient until August 14, 1963, a date subsequent to delivery of the policy of insurance. The proof of death shows that the cause was acute bronchial pneumonia.

The policy provides that the "consideration for this policy is the application therefor, a copy of which is attached hereto and made a part hereof * * * The entire contract between the parties hereto is constituted by this policy, including the provisions set forth on the following pages, and the attached application." The application includes the following questions and answers: "4. Name of Employer or Firm. Self-employed. 5. Occupation Duties. House work. * * * 21B. Are you now in good health and free from defect or deformity? Yes." 20A. "Have you consulted or been treated by any physician or practitioner in past 5 years? A. Yes." We also reproduce that portion of the application about physicians consulted: "Detail space (include all dates and names and addresses of all attending physicians). 20A—Epidermis Infection. Drs. Gillis & Brogdon Mitchell, S.Dak." Plaintiff signed his name and that of his daughter to the application. He certified above his signature (1) that all statements and answers in the application are "complete, true and correct" and (2) that he expected "the company to accept and rely on them".

■■ It is established beyond question that a false representation as to a material fact made by an applicant in reliance on which a policy of insurance is issued renders the policy voidable. Hohenthaner v. Mutual Life Ins. Co. of New York, 62 S.D. 8, 250 N.W. 370; Life Benefit, Inc. v. Elfring, 69 S.D. 85, 7 N.W.2d 133; Ivory v. Reserve Life Ins. Co., 78 S.D. 296, 101 N.W.2d 517; Bushfield v. World Mut. Health & Acc. Ins. Co. of Pa., 80 S.D. 341, 123 N.W.2d 327. That the condition and state of health of applicant was important to accepting or refusing the risk is undeniable.

The application for insurance was taken by I. W. Burlingame and his son Alfred, agents of the defendant. The former asked the questions and the son did the writing. Plaintiff contends substantially that he did not furnish these agents any false information concerning the physical and mental condition of his daughter; that the answers were incorrectly inserted by insurer's agents with full knowledge of the true facts; that the agents did not inform the insurance company of any fact other than those shown in the application; that the defendant made no investigation so as to decide for itself whether to accept the risk although the application revealed the names and addresses of physicians who had treated the insured in the past five years; and that defendant company chargeable with the knowledge of the facts on the part of its agents cannot now defend on the ground that the statements and answers in the application are false.

Plaintiff cites and relies upon cases holding that a person soliciting and procuring an application upon which a policy is issued acts as the agent of the insurer and the insurer will not be permitted to take advantage of any misrepresentation or concealment of a fact material to the risk which is due to the mistake, fraud or other fault of the agent. Thomas v. Modern Brotherhood of America, 25 S.D. 632, 127 N.W. 572; see also Erickson v. Ladies of the Maccabees, 25 S.D. 183, 126 N.W. 259. This rule presupposes good faith on the part of the insured and does not sanction intentional wrong on his part. SDC 3.0208 provides: "An agent can never have authority, either actual or ostensible, to do an act which is, and is known or suspected by the person with

whom he deals to be, a fraud on the principal." In the case of Williams v. Black Hills Benefit Life Association, 70 S.D. 611, 19 N.W.2d 769, this court held that this statute and the general law relative to insurance contracts requires good faith in making answers to questions in an application and if applicant discovers that statements made therein were not based upon facts detailed by him to the agent, it becomes his duty to make known the facts to the insurer.

The obligation to deal fairly and honestly resting on both parties to a contract of insurance was too the requirement of the provisions of SDC 31.0506[1] in force at the time the policy herein was delivered.

Plaintiff sought to prove that the insurer's agents falsified the answers and that the knowledge of the agents became that of the defendant company. The evidence shows that plaintiff took the initiative in making application for insurance and that he knew that the policy applied for would issue in reliance upon the application and the answers therein contained. Upon direct examination, plaintiff testified:

"Q. Now, Mr. Norwick, tell the judge just how you happened to talk to Mr. Burlingame about this insurance policy? * * * A. Well, I saw Mr. Burlingame uptown and we talked a while, general conversation, and I asked him, I said, 'Why don't you come down? I might take out an insurance policy.' So that's all that was said then.

"Q. Did he then later come down to your office? A. Yes.

"Q. And will you tell the court what happened at that time? A. Well, he came down about, I'd say, a week later and brought the application and stuff in the office, and he wanted to know who I wanted the insurance on,

---

1. "Each party to a contract of insurance must communicate to the other in good faith all facts within his knowledge which are or which he believes to be material to the contract and which the other has not the means of ascertaining, and as to which he makes no warranty. Neglect to communicate such facts is concealment. Intentional or unintentional concealment entitles the injured party to rescind a contract of insurance."

and I told him my daughter, and that she was retarded, and he said he had heard that we had a retarded child, and so he asked for her name and address and started filling out the application. * * *

"Q. Now, Mr. Norwick, Mr. Burlingame read this question, 21B, which reads, 'Are you now in good health and free from defect or deformity,' to you? A. Yes.

"Q. And did you answer that question? A. Yes.

"Q. How did you answer that? A. I said no, she's pretty much retarded.

"Q. What, if anything, did he say then? A. He said, 'Well, we filled out applications like that before on retarded people.' * * *

Upon cross-examination the following occurred:

"Q. I call your attention to the application. The answer to question 4, and that's the name of the employer or firm of Jeanne Norwick, is not true, is it? A. No.

"Q. And the answer to question 5, that she was doing housework, is not true, is it? A. No.

"Q. And the answer to question 21B as to whether or not Jeanne Norwick was in good health and free from defect or deformity is not true in the application, is it? A. I figured she was healthy. * *

"Q. Now, I want to ask you something about your relationship with Mr. Burlingame. You say he was a business acquaintance. A. Well, I've known him quite a while. * * *

"Q. And so far as you know, he had never seen anything of Jeanne Norwick, the daughter who is now deceased? A. No. * * *

"Q. And she wasn't able to read or write, was she? A. No.

"Q. She wasn't able to speak? A. No. ✱ ✱ ✱

"Q. She had to have help in dressing herself? A. A little help. ✱ ✱ ✱

"Q. Now, with respect to this application, I think you said you thought she was in good health at the time this application was filled out? A. Yes.

"Q. She was in the hospital though, wasn't she? A. Yes."

Plaintiff admitted that the policy with a copy of the application attached was delivered to his home during the time that his daugher was in the hospital and that it was thereafter in his possession. The following is taken from his further cross-examination:

"Q. And you knew at the time that a copy of the application you had signed earlier was made a part of the policy? A. Yes.

"Q. And knew generally what was in the application, did you not? A. Yes.

"Q. Did you look it over at the time you got the policy? A. I think I did when I got the policy. ✱ ✱ ✱

"Q. I want to go back a little bit to an answer you gave. You said at the time the application was filled out, there was nothing in the 'detail space' below paragraph 24; is that right? A. Yes.

"Q. That was filled out, you say, after the application was signed? As far as I know.

"Q. So there was nothing on the application at the time you signed it to show that Drs. Gillis and Brogdon had ever had anything to do with the girl; is that right? A. Yes.

"Q. However, this material was on the application when it came back with the policy, wasn't it? A. Yes.

"Q. And you observed it at that time? A. Yes."

■■ It must have been obvious to plaintiff from the questions contained in the application that the health and physical condition of applicant were important to defendant company seeking information bearing on the risk which it was asked to assume. The evidence is that insurer's agents had heard that applicant was retarded, but there is no evidence that they knew the extent of applicant's infirmities. The fact that an applicant is retarded may not preclude him from being in good health. Cf Robinson v. Metropolitan Life Ins. Co., 1 App.Div. 269, 37 N.Y.S. 146, aff. in 157 N.Y. 711, 53 N.E. 1131.[2] That plaintiff failed to communicate important and material facts concerning the physical condition and state of health of the applicant which were peculiarly within his knowledge and beyond the knowledge of the agents cannot well be denied. The term "good health" when used in an application for life insurance means that the applicant has no grave, important, or serious disease and is free from any ailment or infirmity that affects seriously the general soundness and healthfulness of the system. Waltner v. Educational Mut. Ben. Ass'n, 66 S.D. 405, 284 N.W. 776; Eastern Dist. Piece Dye Works v. Travelers' Ins. Co., 234 N.Y. 441, 138 N.E. 401, 26 A.L.R. 1505. The infirmities of the applicant were undisputably of a substantial character affecting seriously the soundness and healthfulness of her system and increased the chances of that death against which the defendant was asked to insure.

■■ It appears that plaintiff at one point answered "I said no, she's pretty much retarded" in answer to the agent's question as to whether or not his daughter was in good health and free from defect or deformity which had reference to question 21B in the application. On cross-examination he testified "I figured that she was in good health" when the application was signed. The trial court resolved in favor of the plaintiff the ques-

2. It was held that the provision that the insured must be in good health at the time of delivery of the policy did not void the policy since the fact that an idiot or a cripple or both did not necessarily mean that such a person was not in "good health".

tions of good faith of plaintiff in communicating all facts which he believed to be material to the contract and in answering the questions contained in the application, but it does not follow that plaintiff is entitled to recover under the policy. Apart from any question of the good faith and honesty of plaintiff up to the time of the delivery of the policy together with the application attached, there remains a further question for consideration. The rule that insured or his representative is not responsible for false answers in an application fraudulently inserted by insurer's agent is not absolute. If, after delivery of the policy, he discovers the insertion of false answers correctly answered by applicant, he has the duty to make the facts known to the insurer.

The opinion in Williams v. Black Hills Ben. Life Ass'n, supra, quotes the following language from New York Life Ins. Co. v. Fletcher, 117 U.S. 519, 6 S.Ct. 837, 29 L.Ed. 934: "Assuming that the answers of the assured were falsified, as alleged, the fact would be at once disclosed by the copy of the application, annexed to the policy, to which his attention was called. He would have discovered by inspection that a fraud had been perpetrated, not only upon himself, but upon the company, and it would have been his duty to make the fact known to the company. He could not hold the policy without approving the action of the agents, and thus becoming a participant in the fraud committed."

The rule in many jurisdictions is that where a policy to which the application is attached is accepted and retained by the insured, he is conclusively presumed to have knowledge of its contents and to have ratified any false statements therein even though they were not due to his fault. The reasoning generally is that the insured had the opportunity to examine the application and his failure to so do amounts to a ratification. Other courts make an exception as to insurance contracts and an error in an application prepared by insurer's agent does not become that of insured merely because he failed to learn of it. 81 A.L.R. 833, 117 A.L.R. 790 and 148 A.L.R. 507.

In this state we have no decisions determining the scope of the rule. In the Williams v. Black Hills Ben. Life Ass'n,

supra, it is said: "We may assume in this case that the agent inserted the false answers in the application without the knowledge of Mr. Williams, and we pass the question of the duty of the insured to read the application at the time of signing. * * * We conclude, that in falsifying the answers in the application the agent was acting against the interest of the company, that Mr. Williams was advised of this fact when he read the copy of the application attached to the policy, and because of his failure to notify the company and by retaining the policy he must be deemed a participant in the fraud of the agent." The rule recognized in some jurisdictions to the effect that an applicant is not required before signing to examine the application to ascertain if correct answers were incorporated therein would be of no avail to plaintiff beneficiary. He having examined the copy of the application attached to the policy after delivery could not retain the policy and fail to speak up without approving the action of the agents and thus become a participant in their fraud.

The judgment is reversed and the cause remanded with directions that judgment be entered for the amount of the premium paid to defendant.

RENTTO and BIEGELMEIER, JJ., concur.

HOMEYER, P. J., and HANSON, J., dissent.

HOMEYER, Presiding Judge (dissenting).

I dissent. The record does not convince me the trial judge erred when he found the plaintiff free from fraud, or from any participation in fraud, if a fraud upon the company was perpetrated by its agent. In that regard, I believe this case can be distinguished from Williams v. Black Hills Benefit Life Association, 70 S.D. 611, 19 N.W.2d 769, prominently referred to in the majority opinion. In Williams the evidence was susceptible to no logical inference except that the applicant participated in the agent's fraud.

HANSON, J., concurs in this dissent.