HERDMAN, Respondent and Cross-Appellant
v.
NATIONAL RESERVE LIFE INS. CO., Appellant and
Cross-Respondent

(209 N.W.2d 364)

(File Nos. 11151, 11154. Opinion filed July 12, 1973)

Order denying petition for rehearing August 15, 1973

Thomas E. Simmons, Bangs, McCullen, Butler, Foye & Simmons, Rapid City, for plaintiff, respondent and cross-appellant.

Robert C. Heege, Davenport, Evans, Hurwitz & Smith, Sioux Falls, for defendant, appellant and cross-respondent.

MILLER, Circuit Judge.

Plaintiff commenced this action to recover the proceeds of a life insurance policy issued on the life of her husband in which she was the named beneficiary. The defense was that the

deceased insured, in his application for said policy, had given false and misleading answers to the questions therein, which were material to the risk and which induced defendant to issue the policy which it would not have done had it known the true facts.

Defendant appeals from a judgment entered upon a jury verdict in favor of plaintiff, claiming primarily that the trial court erred in denying its motions for directed verdict and judgment n. o. v. on the grounds that as a matter of law the misrepresentations, omissions, misstatements and concealments of fact by the insured were material to the risk and a reasonable insurer would not have issued the policy at all, or if at all, then at a higher premium rate, if it had known the full, complete and true facts.

Plaintiff has filed a cross appeal arguing first that the trial court erred in refusing to instruct or submit to the jury the question of whether the defendant's refusal was either vexatious or without reasonable cause, and, secondly, that the trial court's determination as a matter of law that such refusal was neither vexatious nor without reasonable cause (and as a result refusing to allow plaintiff a reasonable sum for attorney fees as part of her costs) was erroneous.

Ansel S. Herdman, the insured, died February 19, 1970, of "congestive heart failure due to probable coronary occlusion", some four months after making application for the life insurance policy which is the subject of this suit. He had been married to plaintiff on two occasions. They were first married in 1943, which marriage terminated by divorce in 1958. In 1960 he married his second wife, Reba, who was a laboratory technician in the clinic of Dr. Janss, whose testimony will be alluded to later in this opinion. The marriage to Reba terminated by divorce in 1966, and later that year he remarried plaintiff and remained so married until the time of his death.

Dr. Janss first saw Herdman as a patient in September 1962, when Reba thought he should have an electrocardiogram (EKG). The EKG was taken and was diagnosed by Dr. Janss as a "suspicio[n] of a posterior myocardial infarct, old", of which

Herdman was informed. In addition Dr. Janss determined Herdman's blood pressure was "running rather high" and prescribed diuril, plexonal and phenobarbital, and explained the reasons for the drugs. On July 5, 1963, Reba again thought an EKG was appropriate and upon the same being taken it was diagnosed the same as before, with the addition of an ectopic beat (on that date the blood pressure was still quite high). On July 16, 1963, a repeat EKG was run, revealing the absence of the ectopic beat. Dr. Janss examined EKG's of Herdman again in October 1963, May 1964, and January 1965, all with the same diagnosis as previously made, and each time with an apparent elevated blood pressure. In January 1965, Dr. Janss specifically told Herdman that he did have "heart disease" and told him to limit his activities. In February 1965, he was hospitalized for suspicion of influence of alcohol and, among other things, was given medication to reduce high blood pressure. In December 1965, he was hospitalized because of drinking. Dr. Janss later saw him in April 1966, because of his drinking, at which time he had elevated blood pressure. In April 1967, another EKG revealed no change. In March 1968, Dr. Janss gave him a thorough physical and determined no change in his EKG and further determined that the blood pressure was well controlled. The apparent last time he was seen by Dr. Janss was in August 1969, in the hospital with alcohol problems. During all of the period material herein Herdman was prescribed medications and encouraged by Dr. Janss to take the same, although it would appear that he was not taking them regularly.

Some two months after the hospitalization in September 1969, Herdman made application for the insurance policy which is the subject of this suit. Part of the application was a physical examination by a Dr. Dzintars, and it involved the completion of a questionnaire which was signed by Herdman as being "full, complete and true to the best of [his] knowledge" and wherein he agreed that it would be a part of any policy issued. The answers thereto were given by Herdman and inserted by Dr. Dzintars after the physical examination. The portions thereof which are material to this appeal are as follows:

"3. a. Are you now in good health to the best of your knowledge?...................... Yes.

b. Have you any bodily defects including amputations? ........................... No.

c. Do you contemplate any operations? ....... No.

4. Have you ever had:
a. health examination? (Date and why made?) ...........

b. electrocardiogram, x-ray or other special diagnostic tests? (Date and why made?) ...........

Yes. Gen. checkup by Dr. Janss, Rapid City, S. D., 1967

\* \* \* \* \* \* \* \* \* \* \*

6. Have you ever had any disease or abnormality of:

a. heart or blood vessels, including murmer, high blood pressure, palpitation or pain about the heart or chest? Any medications for these conditions? ........................... No.

\* \* \* \* \* \* \* \* \* \* \*

9. What physician or physicians, if any not named above have you consulted or been treated by, within the last 5 years, and for what illness or ailment? ........................ None."

Dr. Dzintars upon his examination made a cardiac diagnosis of "Normal heart" (no EKG was taken). His blood pressure readings were apparently borderline elevated and therefore the defendant required a follow-up examination which was conducted by Dr. Dzintars three weeks later. The written form providing for the follow-up exam required a blood pressure check (which revealed it to be normal) and asked whether applicant had or was taking medication to control hypertension. Dr. Dzintars at that time obtained the information from Herdman that he was not now taking such medicines but that he only had done so "For 2 or 3 mos, 6 years ago. Name & dosage not known."

Prior to the issuance of the policy, and during the period between the initial and follow-up exams by Dr. Dzintars, defendant requested and received a confidential life report from the Retail Credit Company. The first question therein was, "ANY REASON FOR NOT RECOMMENDING APPLICANT?", to which the answer, "YES.Past habits." was given. In explanation of the above, the following comment was made:

"Ansel Herdman was formerly considered to be a heavy and frequent drinker, he would drink to excess several times a month. AT that time he was known to have 1-3 drinks of beer. Sources feel that it may have been domestic trouble that caused him to drink, his wife divorced him and he remarried and moved back to Rapid City. For the past several years (6-7 yrs.) he has had good personal habits and has not been drinking to excess. He will still drink 1 or 2 drinks on Sat. night or at a party, however does not drink to excess."

In a letter to plaintiff's former counsel refusing to make payment under the policy, an assistant actuary of defendant advised that:

"The information regarding the elevated blood pressure, while not revealed on the application, was turned up from another source prior to the issuance of this policy. But, as indicated, knowledge by us of the hospitalizations for alcoholism would, in and of itself, have precluded our issuance of this policy."

Said actuary testified that the information regarding prior knowledge of the high blood pressure was from the examination by Dr. Dzintars.

A vice president in the underwriting department of defendant testified that it was defendant's policy to treat a diagnosis of "suspicio[n] of a myocardial infarct" as an actual diagnosis of a myocardial infarct and that if such diagnosis was made within one year of the application, coverage would be denied, and if it were within a ten-year period the premium would be rated up. He further testified that their procedure with persons with a

reading of high blood pressure on the initial exam was to obtain supplemental readings, such as was done on the follow-up exam here with Dr. Dzintars, and inquiries would be made if there were current medications being taken. He further testified that his company would wait two years after an alcoholic cure before issuing a life insurance policy at standard premiums.

Defendant denied payment of the proceeds under the policy and tendered return of the premium paid, and defended this lawsuit under the authority of SDCL 58-11-44, which provides:

"All statements and descriptions in any application for an insurance policy or annuity contract, by or in behalf of the insured or annuitant, shall be deemed to be representations and not warranties. Misrepresentations, omissions, concealment of facts, and incorrect statements shall not prevent a recovery under the policy or contract unless either:

(1) Fraudulent; or

(2) Material either to the acceptance of the risk, or to the hazard assumed by the insurer; or

(3) The insurer in good faith would either not have issued the policy or contract, or would not have issued it at the same premium rate, or would not have issued a policy or contract in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise."

Defendant makes no claim that fraud was an issue in the case and, in fact, specifically conceded that it was not.

Plaintiff argues that defendant should be estopped from claiming the benefit of SDCL 58-11-44, contending that by virtue of the Retail Credit Company report defendant had actual

knowledge of true facts or sufficient information therefrom to put it on notice, or placed it under a duty of further inquiry. Plaintiff has cited 43 Am.Jur.2d, Insurance, § 742, which states:

"The mere fact that an insurer, in order to test the truth of the representations made by the applicant, makes an independent investigation, does not in itself lessen the right of the insurer to avoid the policy because of misrepresentations made by the insured in his application, except where the independent investigation either discloses the falsity of the representations or discloses facts which place upon the insurer the duty of further inquiry. Accordingly, if the independent investigation of the insurer does not expose the falsity of the insured's misrepresentations and also fails to disclose facts which put upon the insurer the obligation to proceed with its investigation, the insurer's right to avoid the policy remains unaffected. If, however, it is obvious that the insurer relied exclusively on its own independent investigation and that the insured's misrepresentations constituted not even a contributory influence, they cannot be seized upon by the insurer to avoid the policy. Moreover, where the investigation discloses facts of such a nature as to require further inquiry by the insurer, its failure to make such inquiry will estop the insurer to rely on the insured's misrepresentations in order to avoid the policy."

We do not reject this principle of law, however, it is our opinion that the facts in this case do not warrant its application here.

Several cases similar to this have been before this Court on previous occasions. Perhaps the most prominent of these are: Ivory v. Reserve Life Insurance Co., 78 S.D. 296, 101 N.W.2d 517; Bushfield v. World Mutual Ins. Co., 80 S.D. 341, 123 N.W.2d 327, and Norwick v. United Security Life Co., 82 S.D. 640, 152 N.W.2d 439.

In the Norwick case we held that:

"The term 'good health' when used in an application for life insurance means that the applicant has no grave, important, or serious disease and is free from any ailment or infirmity that affects seriously the general soundness and healthfulness of the system."

In the Ivory case we reiterated the proposition that an insurance policy may be voided when an applicant makes material misrepresentations in reliance upon which the policy is issued. Therein we said:

"False representation in an application for insurance is material to the risk if it is such as would reasonably influence the decision of the insurer as to whether it would accept or reject the risk."

In the Bushfield case we said:

"An insurer is entitled to rely on the truthfulness of answers given in an application * * * It follows, of course, that failure to mention a minor or temporary ailment is not material to the risk and will not avoid the policy. However, the question of materiality does not depend upon what applicant may have deemed to be of no consequence * * * It is clear that a false representation as to a material matter renders a policy voidable without showing that the misrepresentation was made with intent to deceive or that the misrepresentation had a causal connection with the disability claimed under the policy."

■ In the case of Lindlauf v. Northern Founders Insurance Company, 1964, N.D., 130 N.W.2d 86, that court summarized a previous decision relating to the question of when the issue of materiality of the misrepresentations become one of law for the court. Therein the court quoted from a previous case as follows:

" 'Where the application for an insurance policy is made the basis of the insurance contract, is attached to and made a part of the contract, and there are misrep-

resentations in the answers of the applicant to the questions in such application, and it appears from the record that reasonable minds could not differ on the question as to whether the matter misrepresented increased the risk of loss, such question is a question of law for the court.' "

In the case at bar the answers made to the questions above quoted were false and did not reveal to the insurer that the insured had a diagnosis of heart disease and high blood pressure nor that he had taken medication for the same. Further, they did not even reveal the several examinations and EKG's by Dr. Janss nor the various hospitalizations. The application was the basis of the insurance contract and was made a part of it by its terms. The insurer testified that had it known the true facts it would have either refused to issue the policy or would have issued it at higher premiums.

■ Our review of the evidence indicates that reasonable minds could not differ that there were misrepresentations, omissions and concealments in the application and that the matters so misrepresented increased the risk of loss. The court erred in refusing to grant the motion for directed verdict and the motion for judgment notwithstanding the verdict.

The action as to appeal # 11151 is remanded to the circuit court with directions to enter judgment for the defendant and provide that plaintiff is entitled to a return of the premiums paid.

In view of the foregoing opinion as to appeal # 11151, the plaintiff's cross appeal, # 11154, is rendered moot and the appeal is dismissed.

All the Justices concur.

MILLER, Circuit Judge, sitting for DOYLE, Justice, disqualified.